## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| BUFFALO MOLDED PLASTICS, INC. | : | Bankruptcy Case No. 04-12782-TPA |
| d/b/a/ ANDOVER INDUSTRIES | : | Chapter 11 |
| Debtor, | : | |
| | : | |
| BUFFALO MOLDED PLASTICS, INC. | : | |
| d/b/a ANDOVER INDUSTRIES | : | |
| Plaintiff, | : | |
| | : | Adversary No. 05-01111-TPA |
| v. | : | |
| | : | |
| PLASTIC MOLD TECHNOLOGY, INC. | : | Related to Document No. 20, 25 |
| AND COMERICA BANK | : | |
| Defendants | : | |

*Appearances:*      Willard E.  Hawley, Esq. and David B. Salzman, Esq. for Debtor
Mary Kay Shaver, Esq. and Beverly Weiss Manne, Esq. for Plastic Mold
Technology, Inc.
Ralph E.  McDowell, Esq. for Comerica Bank

### *MEMORANDUM OPINION*

The Debtor, Buffalo Molded Plastics, Inc. d/b/a Andover Industries ("Buffalo

Molded") filed the within adversary against Defendants Comerica Bank ("Comerica") and Plastic

Mold Technology, Inc. ("PMT") seeking an order distributing certain, escrowed funds held by its

counsel as a result of prior court Order.  Currently before the Court is the *Joint Motion for Summary*

*Judgment* filed by Buffalo Molded and Comerica and the *Cross-Motion for Summary Judgment* filed

by PMT.  For the reasons expressed below, although numerous issues are now resolved allowing

it to proceed to trial, genuine issues of material fact exist in this dispute.  Therefore, the Joint Motion

for Summary Judgment filed by Buffalo Molded and Comerica is denied.  PMT's Cross-Motion for

Summary Judgment is likewise denied.[1]

---

[1]      The Court's jurisdiction was not at issue.

*FACTS*

Since its 1953 beginning the Debtor engaged in the plastic injection molding business, and was a primary supplier of interior and exterior parts for the automotive and consumer products industries. In that capacity, Buffalo Molded routinely entered into contracts and purchase order arrangements with automotive companies such as General Motors ("GM") to supply parts as well as the tooling necessary to manufacture the parts.[2] The sale of the related tooling for manufacture of these parts constituted approximately 10 to 20% of Buffalo Molded's overall sales revenue. In 1986, Comerica assumed responsibility for financing Buffalo Molded's manufacturing operation. On July 24, 1986 Comerica filed a financing statement and perfected its security interest in substantially all of the personal property assets of Buffalo Molded.

Prior to Buffalo Molded's bankruptcy filing, GM issued purchase orders to Buffalo Molded for certain parts and tooling which involved, among others, the GMX-001 Chevy Painted Rocker, GM Part No.22728688/89 ("Rocker Panel Part") and the Chevy Base Front Door, GM Part No. 15118288/89 ("Front Door Part"). The manufacture of the tooling for the respective parts ("Shipped Tooling") was subcontracted by the Debtor to PMT. Thereafter, PMT manufactured the Shipped Tooling in its Michigan plant. Prior to delivery of the tooling, PMT took certain steps intended to perfect its interest in the same. On December 8, 2003, PMT entered into a "Purchase Money Security Interest Agreement" with Buffalo Molded in anticipation of creating a purchase money security interest in the Shipped Tooling. With the intent of creating a separate lien in the

---

[2]     The Parties filed "Concise Statements of Material Facts" in support of their respective summary judgment motions to which the opposing Party replied. Unless otherwise indicated by the Court, no material dispute exists among the Parties as to the facts relied upon by the Court in rendering this Opinion.

Shipped Tooling pursuant to the *Michigan Ownership Rights in Dies, Molds and Forms Act*, *M.C.L.*

*§§445.611 et seq.* ("Michigan Tooling Lien Act") PMT recorded its name and address on the

Shipped Tooling and noted the same on the December 22, 2003 Pennsylvania financing statement

filed in conjunction with its purchase money security interest.  Despite Comerica's 1986 perfection

of a valid security interest in substantially all of Buffalo Molded assets, including its inventory, at

no time subsequent to taking these "steps" did PMT formally notify Comerica of PMT's intent to

claim a purchase money security interest or lien in the Shipped Tooling.

PMT's cost for the Shipped Tooling as charged to Buffalo Molded was $377,210

which included $360,910 for the Rocker Panel Part and $16,300 for the Front Door Part.[3]  On

October 1, 2004, after "permanent" delivery of the Shipped Tooling to Buffalo Molded in early

June, 2004, GM paid Buffalo Molded the full, designated purchase price for the Shipped Tooling

as part of a larger wire transfer.  Immediately thereafter, Comerica "swept" the Debtor's account

taking receipt of the wired funds.  No payment was ever made by Buffalo Molded to PMT for the

Shipped Tooling.  PMT is currently owed $377,210 for the same.

On October 21, 2004, Buffalo Molded filed its voluntary petition in the present action

under Chapter 11 of the Bankruptcy Code.  Prior to the filing Buffalo Molded subcontracted with

PMT for the manufacture of tooling for other, unrelated GM parts which as of the filing date had not

been shipped to Buffalo Molded ("Unshipped Tooling").  Subsequent to the bankruptcy filing, PMT

asserted that its "priority" lien in the Shipped Tooling continued and demanded payment for the

same from GM.   As a result PMT was unwilling to forward the Unshipped Tooling to Buffalo

---

[3]    At the time of the October 27, 2006 final argument on the pending motions PMT withdrew its claim of $16,300
for the Front Door Part.

3

Molded for production of the unrelated GM parts until it was paid for the Shipped Tooling.  Buffalo

Molded believed PMT's demand for payment inappropriate since upon its receipt of the Shipped

Tooling it became property of the Debtor free and clear of any claim of PMT subject only to the

blanket lien of Comerica.  Since GM had already paid Buffalo Molded for the Shipped Tooling, GM

refused to pay for the tooling a second time.  By the same token, Buffalo Molded and GM were in

immediate need of the Unshipped Tooling.

In order to facilitate Buffalo Molded's possession of the much-needed  Unshipped

Tooling and allow it to meet its obligation to GM, while at the same time creating a fund to protect

PMT in the event it prevailed in the within dispute, on December 16, 2004, the Parties entered into

a Court-approved Stipulation filed at Document No. 185 ("2004 Stipulation").   In the 2004

Stipulation, GM agreed to advance $377,210 to Buffalo Molded representing full payment of PMT's

required purchase price for the Shipped Tooling.  These monies were then placed in escrow and held

by Buffalo Molded's counsel pending resolution of the current dispute.  In return, GM was allowed

to exercise set off rights it held against monies due Buffalo Molded in  regards to other, unrelated

purchases.  The 2004 Stipulation allowed transfer of title to GM for the Shipped Tooling free and

clear of the competing lien claims raised by the Parties in the present matter.  The 2004 Stipulation

transferred the claims of Buffalo Molded, PMT and Comerica  "with the same validity, and in the

same rank and priority" as held by the claimants in the Shipped Tooling prior to entering the 2004

Stipulation.  Except for releasing GM from any further liability, the 2004 Stipulation preserved the

status quo as of that time, the respective liens of the Parties, if any, being transferred solely to the

escrow funds.  *Stipulation,* Document No. 185, ¶¶ 10, 11.  As such, GM has no further interest in

the pending dispute.

## *PROCEDURAL HISTORY*

As noted, Buffalo Molded filed its bankruptcy on October 21, 2004.  On May 4, 2005, Buffalo Molded filed the within adversary proceeding to resolve the competing interests of Comerica and PMT in the monies placed in escrow as a result of the 2004 Stipulation.  In its Complaint, Buffalo Molded claimed that any security interest or lien asserted by PMT was terminated when GM purchased the tooling in its capacity as a good faith purchaser in the ordinary course of business.  Since Comerica immediately swept the Debtor's lockbox account upon receipt of the GM purchase monies, the Debtor claimed that no traceable proceeds existed upon which PMT could assert any lien rights or claim.  Accordingly, the Debtor claimed any potential lien on the proceeds of the GM sale disappeared and the Debtor was entitled to the escrow funds.  In most parts and for obvious reasons, Comerica's Answer agreed with the allegations in Buffalo Molded's Complaint.  Comerica reiterated that GM's purchase was free and clear of PMT's alleged security interest in the Shipped Tooling.  Even if PMT possessed a security interest in the receivable created by the GM sale, Comerica claimed PMT's lien was junior to its prepetition/postpetition security interest since the Shipped Tooling proceeds were neither identifiable cash proceeds, chattel paper or an instrument.

In its Answer PMT specifically denied GM's alleged "buyer in the ordinary course" status and that the sale was in the ordinary course of the Debtor's business.  PMT asserted that its claim to the sale proceeds continued despite deposit of the GM purchase monies in the Debtor's

5

lockbox.[4]  By way of affirmative defense, PMT claimed it held a perfected lien in the Shipped

Tooling pursuant to the Michigan Tooling Lien Act and Michigan common law, and possessed a

perfected purchase money security interest pursuant to Article 9 of the Michigan Commercial Code,

*MCL §§440.9101 to 440.9994*, all of which survived the sale to GM.  As a result of its alleged lien

status in the Shipped Tooling, PMT claimed a right to the proceeds of the same following the GM

sale.

On January 31, 2006, Buffalo Molded and Comerica filed their joint Motion for

Summary Judgment asserting Comerica's right to the escrow funds as a result of its 1986 blanket

lien.  Buffalo Molded and Comerica argue in their motion that Comerica has a valid pre-existing

purchase money security interest in Buffalo Molded's "inventory," as that term is defined and

interpreted under Pennsylvania's Uniform Commercial Code.  *See 13 Pa.C.S. §9324(b).*[5]  Buffalo

Molded and Comerica further claimed in their Motion that based on the characterization of the

Shipped Tooling as inventory, in order to achieve priority PMT must prove that it possessed a

perfected security interest in the Shipped Tooling before it was delivered to Buffalo Molded.  PMT

must also establish that it formally notified Comerica of PMT's intent to claim a security interest

in that same collateral.  *Id.*  Furthermore, even assuming PMT possessed a valid lien, as soon as

PMT delivered the Shipped Tooling to Buffalo Molded, Comerica claims that no collateral existed

to satisfy its lien.  Comerica further contends that since GM purchased the tooling and parts from

---

[4]        At the October 27, 2006 final argument PMT agreed that, although its lien followed to the proceeds from the
tooling sale, because the proceeds were placed in a deposit account in Comerica's control, Comerica's lien over the cash proceeds
takes priority over any claim of PMT in this regard.

[5]        Unless otherwise indicated, the Uniform Commercial Code as adopted by both Pennsylvania and Michigan is
identical.  As such, throughout this opinion the Court will refer to Pennsylvania's adopted version of the UCC.

Buffalo Molded in the ordinary course of business, title to the Shipped Tooling transferred to GM free and clear of any lien claims.  *See 13 Pa.C.S. §9320(a).*  Comerica maintains that its security interest has priority over PMT's alleged lien in the proceeds of the Shipped Tooling because, pursuant to the applicable "first to file or perfect" rules, it is undisputed Comerica's 1986 perfected, blanket lien is prior in time to any PMT lien.  *See 13 Pa.C.S. §9322(a)(1).*  Finally, even if PMT was able to establish a security interest with priority in the proceeds of the Shipped Tooling, Buffalo Molded and Comerica argue that any proceeds from the sale of the tooling to GM are no longer identifiable.

On February 15, 2006, PMT filed its Cross-Motion for Summary Judgment maintaining that it possessed a valid, first and continuing lien in the escrow since it perfected its purchase money security interest in the Shipped Tooling and its proceeds under the Michigan Tooling Lien Act by recording its name and address on the tooling and filing a financing statement.  Alternatively, PMT asserts Comerica does not have a first priority lien in the escrow because it had no interest in the Shipped Tooling after receiving original payment for the same.  In addition, PMT maintains GM cannot avail itself of any "buyer in the ordinary course" defense as a means to take the Shipped Tooling free and clear of PMT's perfected  purchase money security interest because Buffalo Molded is in the business of manufacturing parts as opposed to selling tooling.  PMT further contends it was not obligated to send any authenticated notice to Comerica as the Shipped Tooling qualifies as "equipment" and not inventory.  *See 13 Pa.C.S. §9102.*

## *STANDARD OF REVIEW*

For purposes of resolving a summary judgment motion, *Fed. R. Civ. P. 56* is made applicable to adversary proceedings through *Fed. R. Bankr. P. 7056*.  Accordingly, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions that are part of the record, in addition to any supporting affidavits, demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Fed. R. Bankr. P. 56(c); Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Summary judgment is appropriate if no material, factual issue exists and the only issue before the court is a legal issue.  *EarthData Int'l of N.C., L.L.C. v. STV Inc.*, 159 F. Supp. 2d 844 (E.D. Pa. 2001); *In re Air Nail Co., Inc.*, 329 B.R. 512 (Bankr. W.D. Pa. 2005).  The test under *Fed. R. Civ. P. 56* is "whether the moving party is entitled to judgment as a matter of law." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 786, 777 (3d Cir. 1994).  In deciding a motion for summary judgment, the Court must construe the facts in a light most favorable to the non-moving party.  *United States v. Isley*, 356 F. Supp. 2d 391 (D.N.J. 2004).  Once the moving party satisfies its burden of establishing a *prima facie* case for summary judgment, the non-moving party must do more than raise some metaphysical doubt as to material facts.  *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  No issue for trial exists, in fact, unless the non-moving party can adduce sufficient evidence favoring it on the disputed factual issue such that a reasonable jury could return a verdict in its favor.  *See Celotex*, 477 U.S. at 322.

*ARGUMENTS*

At the time of argument on the pending motions, Comerica, to which Buffalo Molded deferred on the lien priority issue[6], proffered a "decision tree" for the Court to follow in resolving the questions before it, claiming that at best the Court can only follow two paths or "branches" in rendering its decision.  The first branch assumes that both Comerica and PMT have valid, perfected liens in the Shipped Tooling.  Comerica contends that since the Shipped Tooling is inventory, *13 Pa.C.S. §9324* controls which sets forth the applicable priority rules regarding the Parties' perfected liens.[7]  Assuming PMT attempted to perfect a purchase money security interest in the "inventory" for *Section 9324* purposes, PMT concedes it never sent any notice to Comerica of its security interest.  As such, Comerica concludes PMT failed to satisfy the requirements of *Section 9324(b)* for perfecting its lien and therefore Comerica's purchase money security interest takes priority over PMT's lien.  In following its "first branch" of the decision tree, Comerica further contends that

---

[6]     As a result of this deferral to Comerica for purposes of argument, hereafter all references to Comerica's argument includes the Debtor's argument as well.

[7]     **§ 9324.   Priority of purchase-money security interests**

   **(a)**      **General rule: purchase-money priority** . . . .
   **(b)**      **Inventory purchase-money priority.** --Subject to subsection (c) and except as otherwise provided in subsection (g), a perfected purchase-money security interest in inventory has priority over a conflicting security interest in the same inventory; . . . and, except as otherwise provided in section 9327, also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if:

         (1)      the purchase-money security interest is perfected when the debtor receives possession of the inventory;
         (2)      the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;
         (3)      the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and
         (4)      the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes inventory.

   *13 Pa.C.S. §9324.*

9

PMT's lien also fails since it possessed no lien or interest in the proceeds of the Shipped Tooling received by Buffalo Molded from GM which proceeds were thereafter "swept" by Comerica.

In response, PMT argues that at the relevant time in question, any security interest Comerica possessed terminated.  All agree that prior to the establishment of the Court-approved December 2004 escrow, GM had paid Buffalo Molded for the Shipped Tooling.  When Comerica swept Buffalo Molded's account on October 1, 2004, it received reimbursement toward its claim to the extent of the Shipped Tooling.  As a result, PMT claims its two, separate and distinct liens, one under the Michigan Tooling Lien Act and the other being its purchase money security interest, achieved priority over all others since Comerica's lien on the Shipped Tooling terminated upon receipt of payment.  Alternatively, PMT argues that the Shipped Tooling is equipment, not inventory, since its sale was only incidental to the Debtor's business.  The Shipped Tooling was primarily used for making parts and not "held for sale."  Therefore, PMT contends *Section 9324(b)* is not implicated.

Comerica next claims that resolution of this matter is no different if the Court were to follow the "second branch" of its proffered decision tree.  Assuming PMT did acquire a lien pursuant to the Michigan Tooling Lien Act, after duly recording its name and address on the Shipped Tooling and thereafter filing a Pennsylvania financing statement before the Shipped Tooling was sent to Buffalo Molded's plant in Meadville, Pennsylvania, Comerica contends that PMT cannot prevail under the Michigan Tooling Lien Act since the Act does not establish a system of priority of liens.  Rather, pursuant to the "first to file" rules found in the  Michigan "Uniform Commercial Code," *M.C.L. 445.9322,* which Rules are identical to the "rules" set forth in *13 Pa.C.S. § 9322,*

Comerica's 1986 "blanket lien" takes priority over PMT's 2003 purchase money security interest.

In its "second branch" of the proffered decision tree, Comerica analyzes the Shipped Tooling assuming it is "equipment" rather than inventory.  Comerica acknowledges that in such event, *Section 9324(b)* has no application.  Nevertheless, Comerica believes its 1986 blanket lien has priority and controls with respect to the sale proceeds of the Shipped Tooling since GM is a "buyer in ordinary course of business" pursuant to *13 Pa.C.S. §9320(a).*  PMT's counter-argument to the "second branch" of Comerica's proffered decision tree arises by virtue of its lien creditor status under the Michigan Tooling Lien Act.[8]  PMT contends its tooling lien takes priority over Comerica's blanket security interest since its financing statement was timely filed in Pennsylvania before Buffalo Molded received the Shipped Tooling and while it remained in Michigan.  Alternatively, PMT disputes GM's "buyer in ordinary course of business" status.

## DISCUSSION

As noted, the Parties previously entered into a stipulation affecting some of the issues related to the within inquiry. The Court's understanding of the purpose of the 2004 Stipulation was to provide a vehicle for quick resolution of the Shipped Tooling payment dispute then-existing between and among PMT, GM, Buffalo Molded and Comerica as the sale related to its blanket lien on substantially all of the Debtor's assets and PMT's alleged security interest and lien claims.  The 2004 Stipulation had the effect of instituting the action PMT claimed it possessed against GM for

---

[8]        To further buttress its argument in this regard, PMT originally relied upon *13 Pa.C.S. §9317(a)* (which addresses the conflict between security interests and certain lien creditors) but withdrew this argument at the final argument on the pending motions.  *See Transcript of Summary Judgment Argument*, October 27, 2006, Document No. 71, pp. 40-1, l. 15-8.

conversion with GM thereafter joining Buffalo Molded for violation of its title warranties regarding the Shipped Tooling and Buffalo Molded countering for payment of monies held by GM on other, unrelated accounts.   It is in this context we must view the relative rights, duties and obligations of the parties which were frozen as of the time the stipulation was entered.

In return for GM being released from any further liability by the Parties and receiving the Unshipped Tooling, and PMT being paid directly for the same, GM paid into escrow monies equal to the PMT claim against the Shipped Tooling, the source of which being a set off against monies otherwise due the Debtor from GM, and therefore Comerica. These are the escrow funds currently claimed by the Parties.   As such, the only remaining issues for this Court to decide simply involve whether Comerica's all-inclusive security interest takes priority over the purchase money security interest held by PMT, and if so, what if anything is the effect of the Michigan Tooling Lien Act on Comerica's security interest.   As discussed below, if the Shipped Tooling is characterized as inventory Comerica prevails and it is to be awarded the escrow funds.   Likewise, if the Shipped Tooling is deemed equipment and GM is not a buyer in the ordinary course of business, or if the Michigan Tooling Lien is to be given effect, PMT prevails and it receives the escrow funds.   PMT argues that because the Debtor received "full payment" from GM in October, 2004 and immediately paid Comerica "in full" on its lien, Paragraph 11 of the Stipulation must be read in that context. Therefore, since Comerica's lien was "paid" prior to the date of the December 16, 2004 Order approving the Stipulation, Comerica has no claim to the escrow funds.   In light of the intended purpose and resulting effect of the 2004 Stipulation, and because of the Court's understanding of this purpose in the context of the Stipulation's creation, PMT's argument in this regard lacks merit

and does not create an independent basis for recovery on PMT's alleged lien claims.[9]

*Characterization of Shipped Tooling as Inventory or Equipment*

Critical to Comerica's primary argument is for this Court to determine that the Shipped Tooling is inventory rather than equipment.  Once this determination is made, since Comerica then benefits from the notification requirements of *Section 9324(b)* with which PMT admittedly failed to comply, Comerica believes it is entitled to summary judgment in its favor on the lien priority issue.

*Section 9102 (a)* defines "Inventory"as

Goods[10], other than farm products, which:
. . .
(2)    are held by a person for sale or lease or to be furnished under a
       contract of service;
(3)    are furnished by a person under a contract of service; or
(4)    consist of raw materials, work in process or materials used or
       consumed in a business.

*13 Pa.C.S. §9102(a).*

"Equipment" is simply defined as "[g]oods other than inventory, farm products or consumer goods."  *13 Pa.C.S. §9102(a).*

---

[9]        A review of the December 16, 2004 record colloquy by the Parties does not alter the Court's opinion in this regard.  Furthermore, at the time of the preliminary argument on the pending motions, PMT appears to agree with the Court's ruling on this issue.  *See Transcript of Summary Judgment Argument*, April 18, 2006, Document No. 53, pp. 45-6, l. 19-6; pp. 55-60, l. 20-9; p. 67, l. 1-10.

[10]        The Parties do not dispute that the Shipped Tooling qualifies as "goods" defined as "[a]ll things which are movable when a security interest attaches. ..." *13 Pa.C.S. §9102(a).*

The purchase order dated January 14, 2004 issued by GM to Buffalo Molded for the Rocker Panel Part (Ex. D)[11] clearly identified the Shipped Tooling as an item held by Buffalo Molded for ultimate sale to GM. Therefore, Comerica argues at least between Buffalo Molded and GM, the tooling for the Rocker Panel Part appears to have always been intended to be held for sale by Buffalo Molded to GM. It is undisputed that on October 4, 2004, consistent with GM's initial intent to purchase the Shipped Tooling, GM paid Buffalo Molded for the Shipped Tooling. Therefore, at least as early as January 14, 2004, Buffalo Molded's intent to sell the Shipped Tooling to GM appears to be plainly documented. In light of the foregoing, Comerica argues that the Shipped Tooling falls squarely within the statutory definition of "inventory." Because of the "obvious" sale relationship created between Buffalo Molded and GM, Comerica believes summary judgment should be entered in its favor.

When applied to the facts of the case, the language of *Section 9102(a)* defining "inventory" appears clear. The contract documents between Buffalo Molded and GM specifically state that the Shipped Tooling was part of the overall sale contemplated by the Parties. Ex. 2, Ex. C. The Debtor was not only to manufacture the parts created from the Shipped Tooling, but the Shipped Tooling was also part of the contemplated sale transaction. The Debtor "held" the Shipped Tooling "for sale" to GM. As such, Comerica's argument that the Shipped Tooling "falls squarely within the definition of inventory" for the purpose of resolving the pending Motions is somewhat persuasive. *13 Pa.C.S. §9102(a).* On the other hand, PMT adamantly disagrees. PMT believes that before the Court can find the Shipped Tooling to be characterized as inventory a proper

---

[11]      As previously noted, PMT's claim for payment in the amount of $16,300 for the Front Door Part has been withdrawn.

interpretation of *Section 9102(a)* can only occur upon consideration of *Comment 4(a)* to the "Official Comments" of the Uniform Commercial Code ("UCC").  PMT contends that once consideration of *Comment 4(a)* is complete, the Shipped Tooling must be considered "equipment" requiring entry of summary judgment in its favor because the tooling is an integral piece of machinery used to manufacture Buffalo Molded's inventory, i.e., interior and exterior automotive parts.  *Stipulation*, Document No. 185, ¶ 4.

PMT's argument also has appeal.   Intuitively, one would consider an item used to manufacture parts more akin to equipment than inventory.  Admittedly, the "Official Comments"[12] which accompany the Uniform Commercial Code provide interpretative support to aid courts in determining the purpose of a certain code section.  Even though such comments do not carry the weight of a legislative enactment and are not binding, courts often give substantial consideration to them when analyzing the particular code section at issue when the need arises for determining the intent of the legislature in enacting the code section.  *See In re Brace*, 163 B.R. 274 (Bankr. W.D. Pa. 1994); *In re Taylor*, 45 B.R. 643 (Bankr. M.D. Pa. 1985); *Lobianco v. Property Protection, Inc.*, 437 A.2d 417 (Pa. Super. Ct. 1981); *In re Bristol Associates, Inc.*, 505 F.2d 1056 (3d Cir. 1974); Richard F. Duncan et al., *The Law and Practice of Secured Transactions: Working with Article 9*, §1.02[3][a] (2006).

However, when interpreting a state statute, the role of the federal courts is to enforce that statute where possible according to its plain terms.  When the language of a state statute is

---

[12]        The "Official Comments" are promulgated by the National Conference of Commissioners on Uniform State Laws and the American Law Institute.  Although the Official Comments are important in ascertaining the effect of a certain Commercial Code section, they do not stand in the same position as the statute enacting the code.  Richard F. Duncan, *The Law and Practice of Secured Transactions: Working with Article 9,* §1.02[3][a] (2006).

unambiguous and conveys a clear and definite meaning, there is no need to resort to extrinsic tools to determine a state's legislative intent. *1 Pa.C.S. §1921(b),(c)*; *Combs v. Homer Center School District et al.*, 2005 WL 3338885 at *26 (W.D. Pa. Dec. 8, 2005) (in reviewing Pennsylvania statutes there is no need to resort to rules of statutory construction to determine legislative intent when the express language of the statute conveys clear, unambiguous and definite meaning to the words or phrase in question). Comerica argues that where, as here under these facts, the plain meaning of *Section 9102(a)* is clear as it relates to *Section 9320(a)*, and therefore by its terms the Shipped Tooling should be characterized as inventory, a review of the "Official Comments" is inappropriate. While the Court agrees with the general proposition Comerica sets forth, for summary judgment purposes reference to *Comment 4* is helpful in resolving in favor of the non-moving party the effect of any reasonable inferences to be drawn from the material facts at issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

PMT claims *Comment 4(a)*[13] to *Section 9102* supports, among other things, a finding that the Shipped Tooling cannot simultaneously be both equipment and inventory since the classification of goods is mutually exclusive. It must be one or the other. Comerica does not dispute this concept but believes the Shipped Tooling was inventory rather than equipment during the relevant time the Debtor possessed it since the tooling was always "held for sale" by the Debtor to

---

[13]      *Comment 4(a)* is appended to *Section 9102* of the Pennsylvania UCC which is the definitional section of the UCC providing insight on the definition of "goods" and related definitions, not *Section 9307*.

16

GM.[14]  PMT also claims that since the principal use[15] of the Shipped Tooling was to make the GM

parts *Comment 4(a)* requires a finding that the tooling is equipment.  Furthermore, PMT claims

*Comment 4(a)* requires the tooling to be classified as equipment since "implicit" in the definition

of "goods" is that any sale must or will be "in the ordinary course of business."   Therefore,

machinery that is "used in manufacturing is equipment, not inventory" even though the policy of a

seller may be to sell machinery when it becomes "obsolete or worn."  Finally, PMT claims *Comment*

*4(a)* requires that goods used in a business are generally classified as equipment if they are "fixed

assets" or have a relatively long period of use, and conversely classified as inventory, if used or

consumed in a relatively short period of time in producing a particular product.   Citing the

deposition testimony of Nicholas Bogdanos, President of Buffalo Molded, PMT believes the tooling

clearly has a long useful life.

A reading of *Comment 4(a)* makes clear that the examples and considerations used

in interpreting classification of goods as inventory or equipment depend on the context in which the

good is used.   Here, the Shipped Tooling appears to be intended for sale and "held" by Buffalo

Molded from the very beginning of the transaction for that purpose.  Although the Shipped Tooling

was used to manufacture inventory, it was purchased by and "delivered" to GM within ten months

of the issuance  of the initial purchase order.   Nowhere in the record does it appear to have been

intended by Buffalo Molded to be held as a fixed asset.  Granted, its anticipated useful life was of

---

[14]      While *Comment 4(a)* states that the classification of "goods" is mutually exclusive and a "good" cannot be equipment and inventory at the same time, nothing in the Comment restricts goods from being inventory or equipment simply because the good is used to manufacture inventory.

[15]      "Tooling only constituted 10-20% of Debtor's business."  *Debtor and Comerica Bank's Response to PMT's Statement of Uncontested Facts,* Document No. 38, Joint Response No. 8.

a relatively long duration[16], but not so in the hands of Buffalo Molded but rather by its intended user, GM. Nor is there any support in the record for a finding that the Shipped Tooling was being sold because it became "obsolete" or worn.[17] The obvious inference here is that GM's ownership of the Shipped Tooling was essential for maintaining control of its product line giving GM flexibility in selecting its part manufacturers. Consistent with the suggested findings in *Comment 4(a)*, a strong inference arises that the tooling is equipment in the hands of GM but a similar inference does not necessarily follow while it is held by the Debtor.[18]

In its briefs and at argument PMT places great weight on the case of *ITT Industrial Credit v. HNR Machine Service Company., Inc.*, 525 F. Supp. 170 (E.D. Mo. 1981) in support of the proposition that the Shipped Tooling should be considered fixed equipment rather than inventory. In considering the effect of *Section 9-201(9)*, Missouri's UCC counterpart statute to Pennsylvania's *13 Pa.C.S. §9102(a),* the *ITT Industrial Credit* court applied the "buyer in the ordinary course"

---

[16]     *Bogdanos Dep.*, p. 9, l. 2-3; p. 11, l. 19-24; p. 51, l. 18-21.

[17]     *Comment 4(a)* states that "machinery used in manufacturing is equipment, not inventory, even though it is the policy of the debtor to sell machinery when it becomes obsolete or worn." *See also Orix Credit Alliance v. Tooling Connection*, 1995 WL 705213, at *2 (Ohio Ct. App. Dec. 1, 1995) (in applying an Ohio statute similar to the applicable Pennsylvania UCC section, the court found that machinery utilized in the manufacturing process is equipment, not inventory, where seller's continuing policy was to sell obsolete machinery). Examination of the term "obsolete" reveals that the Shipped Tooling was not obsolete by mere fact of its resale to GM. While not defined in the Uniform Commercial Code, "obsolete" is defined by *Black's Law Dictionary* (8th ed. 2004) as "no longer in general use; out-of date." Therefore, use of the word "obsolete" conveys more of a subjective standard. That which is obsolete for one party is not necessarily obsolete in the hands of another party. Merely because Buffalo Molded may have no further, practical use for the Shipped Tooling does not result in obsolescence. Nothing in the record contradicts a finding that the Shipped Tooling would continue to be used in a productive manner by another entity to manufacture other parts and machinery. On the contrary, from the beginning GM intended to purchase the Shipped Tooling evidencing an intent to maintain its availability for continued use. Although it's useful life to Buffalo Molded was limited, the tooling continued to maintain monetary and practical value to GM. Despite the testimony of Nicholas Bogdanos (*See Bogdanos Dep.*, p. 9, l. 2-3) regarding the relative "useful life" of the Shipped Tooling from the Debtor's viewpoint, nothing in the record supports a finding that the Shipped Tooling was obsolete at the time of its delivery by Buffalo Molded to GM. Nor does the record suggest that the Shipped Tooling was worn or incapable of function due to wear and tear. *See Spruce Manor Enterprises v. Borough of Bellmawr*, 718 A.2d 1008 (N.J. Super, 1998) (obsolescence is neither depreciation nor wear and tear but relates to usefulness of an object, in the case a facility, and whether its use is active or fallen into disuse or neglected).

[18]     At the October 27, 2006 final argument, Buffalo Molded claimed that as of October 4, 2004, the time GM made payment for the Shipped Tooling, the Debtor was simply a bailee of GM. As of that date the Shipped Tooling was "delivered" to GM and equipment in its hands.

requirement of Missouri's counterpart statute to Pennsylvania's *13 Pa.C.S. §9320(a)* finding that

the sale of the debtor's bar machine, an integral part of its manufacturing process, could not be

deemed "inventory" for purposes of UCC *Section 9-320(a)* when encumbered by an existing security

interest.  Under the circumstances, the court found the bar machine to be a fixed asset of the debtor

and therefore remained subject to the existing security interest.  This finding was consistent with the

language of *Comment 4(a)* noting that a fixed asset is equipment and not inventory.[19]

The facts in the present case differ dramatically from the example set forth in

*Comment 4(a)* and the *ITT Industrial Credit* case.  Here, the Shipped Tooling appears to have been

classified by the Debtor as inventory from the very beginning of the relationship between Buffalo

Molded and GM.  The goods were "held for sale" from the time the purchase order was issued.  It

appears that at no time was it intended that the Shipped Tooling become a fixed asset of the Debtor.

Unlike the Shipped Tooling, the bar machine in *ITT Industrial Credit* was a long-time fixed asset

of the debtor.  Here, it appears the intended classification of the goods did not change in midstream

from equipment to inventory.  Nor does it appear the intended use if the tooling was dependent on

the current financial needs or means of the Debtor.

Importantly, PMT stipulated that the Debtor "routinely" contracted with GM and

others to supply parts "as well as the tooling necessary to manufacture such parts."  *Stipulation*,

Document No. 185, ¶ 4.[20]  The effect of this stipulated fact is to support the suggestion found in

---

[19]        "The authorities reviewed by this Court would seem to indicate that a seller may not shift a good from equipment
to inventory status and then terminate the effective security interest employed by a secured party by selling that good." *ITT Industrial
Credit*, 525 F. Supp. at p. 172.

[20]        Although PMT argues the Court should ignore the effect of the fact stipulated to in Stipulation, ¶ 4 as it relates
to classifying the Shipped Tooling as inventory, in light of the current record the Court is required to give the Stipulation its intended
effect.  *See In re Robert T. Noel Coal, Inc.,* 97 B.R. 254, 255 (W.D. Pa. 1989) (stipulations serve as surrogates for findings of fact
and are binding on the court as well as the parties).

*Comment 4(a)* that in order to classify the Shipped Tooling as inventory, its sale must be in the ordinary course of the Debtor's business. In stating that "implicit" in the classification of goods as inventory the sale will be in the "ordinary course of business," *Comment 4(a)* does not impose or refer to a "buyer in the ordinary course" standard similar to that found in *Section 9320(a)*. The Comment simply suggests that if a good is determined to be inventory, its sale should be in the ordinary course of the debtor's business. Here we have a stipulation that Buffalo Molded "routinely" sold tooling coupled with testimony that the sale of tooling was 10 to 20% of the Debtor's business and documentation indicating that the Shipped Tooling was held for sale by the Debtor to GM. As such, a strong indication exists that the Debtor's sale of the Shipped Tooling was "in the ordinary course" of its business, in this instance, its business with GM.[21]

Regardless of the foregoing, PMT does raise legitimate concerns as to the characterization of the Shipped Tooling when considering its intended use. That the Shipped Tooling was primarily used for the manufacture of parts supports PMT's claim in this regard and is somewhat problematic as to Comerica's characterization of the tooling as inventory. *Comment 4(a)* provides specific assistance in distinguishing "goods" used as inventory and equipment as well as use of the term "consumer goods." Apparently it is from the later portion of the Comment that PMT derives its "principal use" doctrine. Similarly, some courts believe that the classification of

---

[21]    The underlying assumption running throughout the Debtor and Comerica's Joint Motion for Summary Judgment, their briefs, their arguments, and particularly in Comerica's "decision tree" is that PMT stipulated that the the Shipped Tooling constitutes inventory under *13 Pa.C.S. §9102(a)*. As such, the Court began its analysis by initially deciding the issue of whether the tooling is in fact inventory. Where the issue is not so clearly resolved by the conduct of the parties, some courts believe the more appropriate approach in resolving the issue is to initially analyze whether a particular entity is in the "business of selling goods of that kind." *See United States v. Handy and Harman*, 750 F.2d 777 (9th Cir. 1984) (if a person is in the business of selling goods, the goods that he or she holds for sale are necessarily inventory); *National Commercial Co. v. Cobb*, 778 P.2d 205 (Alaska 1989) (the question of whether the collateral was inventory depended on whether the selling party was in the business of selling goods of that kind); *John Deere Co. v. Jeff DeWitt Auction Company*, 690 S.W.2d 511 (Mo. Ct. App. 1985). Regardless of the approach taken, consistent with the suggestion in *Comment 4(a)* at some point in the process courts ultimately must consider whether a debtor is in the "business of selling goods of that kind."

collateral as either equipment or inventory is determined by the intended use of that collateral at the time the security agreement is executed. *In the Matter of Benton Trucking Service, Inc.*, 21 B.R. 574 (Bankr. E.D. Mich. 1982); *John Deere Company v. Jeff DeWitt Auction Company*, 690 S.W. 2d 511 (Mo. Ct. App. 1985). PMT's reliance on these sources creates a reasonable inference that a different use of the Shipped Tooling was contemplated by the Debtor.

Unlike the case of determining the proper use of the phrase "consumer goods," the Court believes the more appropriate course in determining whether "goods" are inventory or equipment is not based on their "primary use" but the purpose for which they are held. In so defining inventory, the Court takes its lead from the clear language of *Section 9102(a)* which makes no reference to the use of the "goods" in question. The sole criteria is whether the goods are held for sale. The statute places no restriction on whether the sale of goods is consistent with the seller's primary business purpose or secondary and incidental to it, as is the case here.[22]  Nevertheless, examination of the *Benton* and *John Deere* cases places the issue in a somewhat different light giving rise to reasonable inferences which may change a reasonable jury's factual determination of the matter.

Examining all the evidence in the light most favorable to the non-moving party and resolving inferences in the non-moving party's favor, a reasonable jury could return a verdict for the respective, non-moving party in regards to each motion. Therefore, a genuine dispute exists as to

---

[22]      For example, it is difficult for the Court to imagine a dispute among the Parties that the windshield wipers and related auto accessories sold by an automobile tire dealer would constitute anything other than inventory when sold in conjunction with the dealer's inventory of tires even though those wiper blades and accessories were admittedly only incidental to the dealer's primary business of tire sales. Here, the Parties admit that Buffalo Molded was in the business of selling parts and tooling. *Stipulation,* Document No. 185, ¶ 4. Albeit, the sale of tooling, forming 10% to 20% of the Debtor's business, was incidental to the Debtor's primary  parts sale business when the need for such sale arose. *See Bogdanos Dep.* P. 51, l.18-21, *Joint Response to PMT, No. 8.*

whether the Shipped Tooling may be characterized as inventory or equipment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). As such, each motion for summary judgment is denied.

Buffalo Molded and Comerica believe that even if the Shipped Tooling is characterized as equipment, judgment should be entered in their favor as a matter of law. Having determined that for purposes of summary judgment the Court is unable to finally determine whether the Shipped Tooling is properly characterized as inventory or equipment, our focus shifts to the application of *Section 9320(a)* as it relates to GM's status as a buyer in the ordinary course of business.

## *Buyer in Ordinary Course of Business*

As noted, for all the reasons set forth in *Comment 4* of *Section 9102(a)*, PMT believes the Shipped Tooling should be characterized as equipment rather than inventory. As such, PMT argues that pursuant to *Section 9324(a)*[23], its equipment purchase money security interest takes priority over Comerica's pre-existing, blanket security interest, and pursuant to *Section 9315(a)(1),* survives the sale to GM. Buffalo Molded and Comerica counter that even assuming the Shipped Tooling was characterized as equipment at the time of its sale, since GM qualifies as a "buyer in

---

[23]     **§ 9324. Priority of purchase-money security interests**

   **(a)**     **General rule:   purchase-money priority.**—Except as otherwise provided in subsection (g), a perfected purchase-money security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods, and, except as otherwise provided in section 9327 (relating to priority of security interests in deposit account), a perfected security interest in its identifiable proceeds also has priority if the purchase-money security interest is perfected when the debtor receives possession of the collateral or within 20 days thereafter.

   *13 Pa.C.S. §9324(a)*

ordinary course of business" pursuant to *Section 9320(a)*, GM took possession of the Shipped Tooling free and clear of PMT's alleged equipment purchase money security interest.

As sole support for their position, Buffalo Molded and Comerica again refer to the language of Paragraph 4 of the 2004 Stipulation. Because Paragraph 4 states that the Debtor "routinely contracts with automotive companies such as GM to supply parts to them, as well as the tooling necessary to manufacture such parts," the Debtor and Comerica claim PMT has effectively stipulated away GM's status at the time of sale, admitting that at all relevant times GM was a "buyer in the ordinary course of business" thereby foreclosing further inquiry into the issue. While the Court believes the language of Paragraph 4 bears weight on its final decision in this regard, in the Court's mind, the quoted language does not foreclose inquiry into GM's status under *Section 9320(a)* especially for purposes of summary judgment. *Section 9320(a)* of the Pennsylvania UCC states the following:

> **§ 9320.  Buyer of goods**
>
> **(a)**    **Buyer in ordinary course of business.** – Except as otherwise provided in Subsection (e), a buyer in ordinary course of business, other than a person buying farm products from a person engaged in farming operations, takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence.
>
> *13 Pa.C.S. §9320(a).*

A "buyer in the ordinary course of business" in relevant part is defined as:

> **"Buyer in ordinary course of business."**   A person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ....
>
> *13 Pa.C.S. §1201.*

At the time of the final argument on the motions, PMT correctly pointed out that unless the sale of tooling is deemed to be in the ordinary course of Buffalo Molded's business, a finding also relevant to the characterization of the tooling as inventory or equipment, *Section 9320(a)* has no applicability in this case.   PMT claims a finding as to one characterization necessarily excludes the other.   In support of its claim that GM is not a *Section 9320(a)* "buyer in ordinary course" PMT cites a number of cases.   Depending on the ultimate characterization of the collateral as inventory or equipment, the cited cases may or may not be distinguishable since they involve the sale of fixed asset equipment, obsolete equipment or incidental equipment sales.[24]

Here, even though the Shipped Tooling may ultimately be characterized as equipment, if it is determined the sale of tooling otherwise complies with *Section 9320(a)*, GM may still be deemed a buyer in the ordinary course of business as contemplated by *Sections 1201* and *9320(a)*.   Assuming the Shipped Tooling is equipment since not specifically "held for sale," because Paragraph 4 of the 2004 Stipulation contains an admission that part of the Debtor's business included tooling sales, under the facts of this case the Shipped Tooling sale to GM could be deemed in the ordinary course of the Debtor's business even though characterized as equipment.   In such event, GM could be found to be a "buyer in ordinary course" under *Section 9320(a)* thereby taking the Shipped Tooling free of PMT's security interest.   *See ITT Industrial Credit Co. v. H&K Machine*

---

[24]      *Hempstead Bank v. Andy's Car Rental System, Inc.*, 35 A.D. 2d 35 (N.Y. App. Div. 1970) (in reversing a jury verdict for a number of reasons, the court found a rental car company in the business of leasing cars not the business of selling them therefore, its periodic sale of used rental cars was found to be merely "incidental" to its leasing business);   *Aircraft Trading and Services, Inc. v. Braniff, Inc.*, 819 F.2d 1227 (2nd Cir. 1987) (commercial airline carrier's sale of jet aircraft engine presumed to be equipment since sold only upon carrier approaching financial difficulties with no indication engine was  originally intended to be "held for sale"); *Northern Commercial Company v. Cobb*, 778 P.2d 205 (Alaska 1989) (unauthorized sale of collateral with no "purchase order" or equivalent documentation establishing collateral at issue was ever intended to be "held for sale"); *Orix Credit Alliance, Inc. v. Tooling Connection, Inc.*, 1995 WL 705213 (Ohio App. 3d 1995) (machinery used in manufacturing process found to be equipment and despite policy of defendant to sell obsolete equipment, no "buyer in the ordinary course" status attained by purchaser since defendant not in business of selling collateral); *Sindone v. Farber*, 432 N.Y.2d 778 (N.Y. Sup. Ct. 1980) (sale of a tow truck by an auto salvage business as a "fixed asset used in the operation of the auto salvage business" deemed equipment and not inventory).

*Service Co., Inc.*, 525 F. Supp. 170 (E.D. Mo. 1981) (upon its sale by debtor, merely because collateral characterized as equipment did not exclude the possibility that the third party purchaser was a "buyer in ordinary course" which status the court proceeded to analyze under the facts of the case in order to determine whether third party took the collateral free of creditor's security interest).

Similarly, factual arguments exist for finding that *Section 9320(a)* does not apply. Some courts have looked to the terms of the applicable financing statement to determine whether the public record provided any indication to the collateral buyer that its sale was prohibited ostensibly supporting a finding in this case that GM does not qualify as a *Section 9320(a)* purchaser. *See In re Robert Noel Coal, Inc.*, 97 B.R. 254 (Bankr. W.D. Pa. 1989) (review of the public record provides no notice that sale of collateral was prohibited and financing statements suggest the possibility of sale since security interest also taken in the proceeds of sale); *In the Matter of Benton Trucking Service, Inc.*, 21 B.R. 574 (Bankr. E.D. Mich. 1982) (classification of collateral as either equipment or inventory is determined by the intended use of collateral at the time the security agreement is executed); *John Deere Company v. Jeff DeWitt Auction Company, Inc.*, 690 S.W. 2d 511 (Mo. Ct. App. 1985) (acknowledging probative value of terms contained in security agreement in denying summary judgment since court unable to characterize collateral as either inventory or equipment).  Here, the financing statement omits any reference that PMT is to be secured in the proceeds of any sale of the Shipped Tooling raising a reasonable inference that the tooling was not available for sale.  (Ex. C, C-1).  Furthermore, in the financing statement there is a secondary reference to a "Special Tools Lien Act and/or the Mold Builders Lien Statute, as amended" also

raising a reasonable inference that the Shipped Tooling was not available for sale.[25]

Based on the record before the Court neither Buffalo Molded nor Comerica have demonstrated as a matter of law that GM is a buyer in the ordinary course of business as required by *Section 9320(a)*. As such, summary judgment is not available to them in this regard. For similar reasons, since on the current record a genuine dispute exists as to the *Section 9320(a)* status of GM, PMT's summary judgment motion must also be denied in this regard.

*Michigan Tooling Lien Act*

Regardless of Comerica's claimed security interest in the Shipped Tooling, PMT maintains it is entitled to the escrow funds because of its separate and distinct tooling lien established pursuant to the Michigan Tooling Lien Act.[26] PMT contends that since it "perfected"

---

[25]     Buffalo Molded argues that the Security Interest Agreement prepared by PMT refers to the Shipped Tooling as "inventory" and therefore indicates a contrary intent. In the context the term is used in the Security Interest Agreement, the Court reads the use of that term as referencing the Shipped Tooling as PMT's inventory not that the Shipped Tooling was ever intended to be inventory in the Debtor's hands. Although a review of the Purchase Money Security Interest Agreement (Ex. B) appears to make clear that PMT intended to prohibit the sale of the Shipped Tooling without its prior consent, for summary judgment purposes the current record does not indicate whether GM ever had notice of the Security Interest Agreement and therefore we must assume it did not.

[26]     **445.619.   Record on die, mold, or form; financing statement; attachment of lien**

Sec. 9.
(1)     A moldbuilder shall permanently record on every die, mold, or form that the moldbuilder fabricates, repairs, or modifies the moldbuilder's name, street address, city, and state.

(2)     A moldbuilder shall file a financing statement in accordance with the requirements of section 9502 of the uniform commercial code, 1962 PA 174, MCL 440.9502.

(3)     A moldbuilder has a lien on any die, mold, or form identified pursuant to subsection (1). The amount of the lien is the amount that a customer or molder owes the moldbuilder for the fabrication, repair, or modification of the die, mold, or form. The information that the moldbuilder is required to record on the die, mold, or form under subsection (1) and the financing statement required under subsection (2) shall constitute actual and constructive notice of the moldbuilder's lien on the die, mold, or form.

(4)     The moldbuilder's lien attaches when actual or constructive notice is received. The moldbuilder retains the lien that attaches under this section even if the moldbuilder is not in physical possession of the die, mold or form for which the lien is claimed.

its lien against the Shipped Tooling as required by the Act, i.e., PMT recorded its name on the

tooling and on December 22, 2003 filed a Pennsylvania financing statement while the Shipped

Tooling was located in Michigan all prior to its delivery to Buffalo Molded's Meadville,

Pennsylvania facility, its lien in the collateral takes priority.[27]   The Debtor and Comerica contend

the Michigan Tooling Lien Act and any lien created thereby  has no applicability once the Shipped

Tooling was delivered to the Debtor's Pennsylvania facility.   They assert that since Pennsylvania

law controls and no similar Pennsylvania or related counterpart statute exists giving independent

effect to the apparently unique Michigan statute, as a matter of sovereignty,  this Court is not bound

by an extraterritorial legislative enactment owing its existence and effect solely to Michigan law.

As such, Buffalo Molded and Comerica take the position that this Court must apply Pennsylvania

law which supports a finding that Comerica's 1986 blanket security interest including the after-

acquired property of the Debtor, controls and takes priority over any lien created by the Michigan

Tooling Lien Act.   Accordingly, the issue before the Court in this regard is whether the Michigan

Tooling Lien Act is enforceable in Pennsylvania so as to give effect to PMT's extraterritorial lien

thereby granting it priority over Comerica's security interest.

In deciding a choice of law question,  this Court is required to apply the choice of law

rules of the state in which it sits.  *See Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020

---

. . .
(6)     The priority of a lien created under this act on the same die, mold, or form shall be determined by the
time the lien attaches.  The first lien to attach shall have priority over liens that attach subsequent to
the first lien.
*M.C.L. 445.619.*

[27]     Buffalo Molded and Comerica dispute that PMT complied with the requirements of the Michigan Tooling Lien
Act in perfecting its lien.  Based upon the Court's review of the Michigan Tooling Lien Act in conjunction with the Brian D.
Scheidmantel Affidavit (Ex. D) for purposes of PMT's pending motion, there is no genuine dispute that PMT took the necessary steps
to comply with the perfection requirements of the Michigan Tooling Lien Act.

(1941); *Shuder v. McDonald's Corp.*, 859 F.2d 266,269 (3d Cir. 1988); *Kaplan v. First Options of Chicago, Inc.*, 1995 WL 500599, at *10 (E.D. Pa. Aug. 22, 1995). Thus, Pennsylvania's choice of law rules apply in determining which substantive law this Court applies in deciding whether to give effect to PMT's tooling lien. Pennsylvania's approach to choice of law questions is a hybrid form of the "most significant relationship" approach of the Restatement (Second) of Conflicts of Law and the governmental interest approach. *On Air Entertainment Corp. v. National Indem. Co.*, 210 F.3d 146 (3d. Cir. 2000); *Taylor v. Mooney Aircraft Corporation et al.*, 430 F. Supp. 2d 417 (E.D. Pa. 2006); *Gallagher v. Medical Research Consultants, LLP,* 2004 WL 2223312, at *3 (E.D. Pa. Oct. 1, 2004); *Troxel v. A.I. duPont Institute*, 636 A.2d 1179 (Pa. Super. Ct. 1994), *appeal denied* 647 A.2d 903 (1994). Pennsylvania's flexible methodology applies to both contract and tort actions. *See Melville v. Am. Homes Ins. Co.* 584 F.2d 1306, 1311-13 (3d Cir. 1978); *Gallagher,* 2004 WL 2223312*,* at *3. Although the within matter involves issues arising from the "Property" field of law, as part of our analysis we must consider the effect of a security interest created by contract. Therefore the hybrid approach adopted by Pennsylvania also applies to the within inquiry. *Taylor,* 430 F. Supp. 2d at 429.

In applying the hybrid approach, Pennsylvania requires that the reviewing court conduct a two-step analysis. "Before a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law." *Huber v. Taylor*, 2006 WL 3071384, at *5 (3d Cir. Oct. 31, 2006)*; LeJuene v. Blass-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996); *Troxel v. A.I. duPont Institute*, 636 A.2d 1179 (Pa. Super. Ct. 1994); *Rosen v. Tesoro Petroleum Corporation*, 582 A.2d 27 (Pa. Super. Ct. 1994). As such, the court must first determine whether there actually is a conflict of laws or simply the existence of a "false conflict." If a true conflict

exists between the potentially applicable laws, in Pennsylvania the reviewing court then determines

which state has the greatest interest in the application of its law through use of the "most significant

relationship" test of the Restatement (Second) of Conflict of Laws.  *Huber*, 2006 WL 3071384, at

*5;  *LeJuene,* 85 F.3d at 1071.  In ascertaining the existence of a true conflict, courts begin by

comparing the ostensibly competing state laws and the governmental interests they represent.  "In

other words,  at this stage of Pennsylvania's choice-of-law analysis, a court should first compare the

court's disposition of the issue if it follows the law of one state with its disposition of the same issue

if it follows the law of the other state; and, second, consider whether the governmental interests

clash."  *Gallagher,* 2004 WL 2223312, at *4.

        In a legislative enactment apparently unique to the state of Michigan, by way of legal

fiction, tooling manufacturers are able to create lien rights in the tooling they manufacture and own

simply by complying with the identification and filing requirements of the Michigan Tooling Lien

Act.  Furthermore, these lien rights attach and become effective at the time a financing statement

is filed and *before* the debtor acquires any rights in the collateral contrary to traditional notions that

liens or encumbrances held by a secured party merge into the legal title when legal title vests in the

secured party.  In contrast and as previously mentioned, Pennsylvania has no similar, related or

counterpart statutory enactment.  Rather, as to items of personal property, Pennsylvania employs a

"first to file" lien priority system embodied in its UCC with the liens attaching only after the debtor

acquires rights in the property.  *See 13 Pa.C.S. §9322.*

        Therefore, if this Court were to give effect to the Michigan Tooling Lien Act, PMT's

tooling lien created *before* Buffalo Molded received the Shipped Tooling and obtained any rights

in the same would trump Comerica's after-acquired security interest since it attached before Comerica's lien attached.   On the other hand, if this Court were to ignore the effect of the Michigan Tooling Lien Act, and give effect to applicable Pennsylvania law, which has no comparable tooling lien statute, the Pennsylvania UCC would control.   Comerica's security interest in Buffalo Molded's after-acquired property would then immediately attach upon delivery of the Shipped Tooling to the Debtor in Pennsylvania simultaneously with PMT's security interest.   However, Comerica's lien would be "first in time" thereby subordinating PMT's security interest.[28]   Thus, resolution of the claims differs dramatically depending on the applicable law.   As such, a true conflict exists between Pennsylvania and Michigan law.   In light of the above finding, we must now consider whether a clash exists between the governmental interests these laws represent.   *LeJuene v. Blass-Salem, Inc.*, 85 F.3d at 1071.

In employing a legal fiction to create a lien in property owned by the lien creditor, the Michigan Tooling Lien Act appears to achieve at least one significant governmental interest unique to Michigan.   Apparently the statute  is designed to advance the purely local interests of Michigan tooling manufacturers in their dealings with the automotive industry which plays such an important role in the Michigan economy.   Because Pennsylvania's General Assembly never enacted a similar statute, one must be careful to avoid speculating as to any legislative intent inferred from its silence in this regard.   Nevertheless, a fair inference does arise from Pennsylvania's inaction when considering Pennsylvania's adoption of the Uniform Commercial Code which is geared to an obviously predominate policy interest of creating a uniform interstate system of lien priority rules

---

[28]         Of course, this scenario would be subject to the Court's resolution of the inventory/equipment issue previously addressed in this Opinion.

outweighing any interest Pennsylvania may have in protecting parochial manufacturing concerns. As such, just as the laws themselves, or lack thereof, clash, so do the policies behind them. Therefore a true conflict exists between the Michigan Tooling Lien Act and Pennsylvania's lack of the same since "the governmental interests of both jurisdictions would be impaired if (their respective) laws were not applied." *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187, 187 n.15 (3d Cir. 1991); *Gallagher v. Medical Research Consultants, LLP,* 2004 WL 2223312, at *5.

Once a true conflict becomes apparent, a court applying "Pennsylvania law should use the Second Restatement of Conflicts of Law as a starting point and then flesh out the issue using an interest analysis." *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 463 (3d Cir. 2006). The first step in this aspect of the reviewing court's analysis is to characterize the particular issue as one of tort, contract or some hybrid and thereafter apply the appropriate Restatement section for guidance. *Taylor v. Mooney Aircraft Corporation*, 430 F. Supp. 2d at 429.  Once the field of law is identified, to effectuate the second prong of Pennsylvania's hybrid approach, the reviewing court first identifies the relevant connecting facts or contacts between each state with an interest in the subject matter at issue and then weighs those contacts in accord with the relevant policy oriented factors found in *Section 6* of the Second Restatement.  *Gallagher v. Medical Research Consultants, LLP,* 2004 WL 2223312, at 6.  Furthermore, a particular state's contacts are measured on a qualitative rather than a quantitative basis.  Thus, more than a mere "counting" of the contacts is required.  *Troxel v. A.I. duPont Institute*, 636 A.2d at 1181.

As with the contract and tort fields of law, in the property field of law specific sections of the Second Restatement specify the relevant, important contacts between each state to

be weighed when considering the policy oriented factors found in *Section 6* of the Second

Restatement.  At the time of the final argument on the pending motions, PMT admitted that it relies

exclusively upon the interplay of *Sections 251* and *252* to support the application of the Michigan

Tooling Lien Act.[29]  Therefore, in the absence of an effective choice of law by  the parties[30], PMT

contends that because *Section 251(2)* states the "location"of the collateral at the time the tooling lien

attached, i.e., Michigan,  is a connecting fact of significant importance, the balance tilts in PMT's

favor requiring this Court to apply the Michigan Tooling Lien Act.

 *Section 251* states the following:

 **§ 251.  Validity and Effect of Security Interest in Chattel**

 (1)   The validity and effect of a security interest in a chattel has between
the immediate parties are determined by the local law of the state which,
with respect to the particular issue, has the most significant relationship to
the parties, the chattel and the security interest under the principles stated
in § 6.

 (2)   In the absence of an effective choice of law by the parties, greater
weight will usually be given to the location of the chattel at the time that the
security interest attached than to any other contact in determining the state
of the applicable law.

 *Restatement (Second) of Conflict of Laws, §251* (1971).

PMT correctly points out that even though here the effect of a statutory lien is at issue and the

Second Restatement "speaks" in terms of "security interests" which owe their being to security

---

[29] PMT merely directs the Court to the language of *Sections 251* and *252* without any conflict of law analysis or
supporting case law.

[30] Here, there is no clear expression of intent to select the law of Michigan or Pennsylvania. *See Roadway Package
System, Inc. v. Kayser*, 257 F.3d 287 (3d. Cir. 2001) (generic choice of law clause in parties' agreement did not manifest a clear intent
to incorporate Pennsylvania's standards for judicial review); *American Mint LLC v. Gosoftware, Inc.*, 2006 WL 42090, at *3 (M.D.
Pa. Jan. 6, 2006) (a choice of law clause in a contract was not effective to the extent it failed to "expressly exclude" foreign law
through affirmative language).

interest agreements, *Comment f* to *Section 251* makes *Sections 251* and *252* applicable to non-consensual liens such as those created by the Michigan Tooling Lien Act. *Restatement (Second) of Conflict of Laws, §251 cmt. f* (1971).

      The fact that the tooling was manufactured in Michigan and PMT's lien pursuant to the Michigan Tooling Lien Act attached and was perfected while the Shipped Tooling was in Michigan appear to constitute the only contacts between the Shipped Tooling and Michigan, the latter of which being the relevant contact for the conflict of law analysis.  PMT identifies no other contacts.  On the other hand, the Shipped Tooling was subcontracted by Buffalo Molded to PMT from its Pennsylvania facility and ordered by Buffalo Molded from Pennsylvania pursuant to various purchase orders with all Parties being aware that the tooling would, in a relatively short time following manufacture, be delivered out of Michigan to Buffalo Molded's Meadville, Pennsylvania facility.[31]  At all relevant times, Buffalo Molded and PMT fully intended the Shipped Tooling to be delivered to Buffalo Molded's Pennsylvania facility.[32]   In its brief and at final argument on these motions, PMT admitted the tooling was initially delivered in April, 2004 and then temporarily returned to PMT for adjustments.  Thereafter, in early June, 2004, the tooling was "permanently" delivered to the Debtor's Pennsylvania facility.[33]  Upon "permanent" delivery to Pennsylvania, the Shipped Tooling was extensively used by the Debtor to manufacture the required GM  parts.  The ultimate sale of the Shipped Tooling to General Motors was arranged from Buffalo Molded's

---

[31]    *Bogdanos Dep.*, p. 22, l. 24-5, p. 24, l. 8-9, p. 31, l. 24-5, p. 32, l. 25, p. 33, l. 1, 8, p. 34, l. 5-6.

[32]    *Bogdanos Dep.*, p. 48, l. 15-18.

[33]    *Brief in Response to Order Dated September 26, 2006 and Supplemental Order Dated October 10, 2006*, Document No. 63 at 2; *see also* Ex. C; *Transcript of Hearing on Summary Judgment Argument*, October 27, 2006, Document No. 71 at 6-7.

Pennsylvania plant and "delivered" to GM in Pennsylvania at the time GM made final payment.[34]

Following its delivery, the Shipped Tooling appears to have physically remained in Pennsylvania

for an unknown period of time, which situation may continue even as of this time.[35]  As such, at least

quantitatively, the Shipped Tooling's minimal contacts to Michigan are far outweighed by its

Pennsylvania contacts.

PMT claims that despite the Pennsylvania connecting facts, since its tooling lien

"attached" while the tooling was physically located in Michigan, *Section 251(2)* requires this lone

contact to trump all others.  The Court does not agree.  *Section 251(2)* merely states that the location

of the collateral at the time the lien attaches is "usually" given greater weight in determining the

state of applicable law.  *Section 251(2)* makes clear that the weight given the contact is conditional.

In discussing this point further, recognizing the "value of certainty and predictability," *Comment e*

to *Section 251*, states:

> The importance of a chattel's location at the time the security interest
> attached in the choice of the applicable law depends somewhat upon the
> intended permanence of this location.  If the parties intended that the chattel
> should remain in this location more or less permanently, the state of the
> chattel's location will in all probability be the state of most significant
> relationship and thus the state of the applicable law.  The situation is
> different when it is understood that the chattel will be kept only temporarily
> in the state where it was located at the time the security interest attached.
> Here it is more likely that, with respect to the particular issue, some other
> state will have the most significant relationship to the parties, the chattel
> and the security interest and be the state of the applicable law....
>
> ...

---

[34]     *Bogdanos Dep.*, p. 42, l. 14-20.

[35]     As of the time of final argument, the Parties were as yet unaware as to whether the Shipped Tooling had been removed by GM from the Debtor's Pennsylvania facility.   For purposes of this discussion the Court must assume the Shipped Tooling remains in Pennsylvania.

> In determining the state of most significant relationship, and thus of the applicable law, the forum will consider other contacts in addition to the location of the chattel, or group of chattels, at the time the security interest attached. So the forum will consider the domicile, nationality, place of incorporation and place of business of the parties. Also where it is understood that a chattel will be moved to a more or less permanent location following the creation of the security interest, the forum will give consideration to the place of its intended destination.

*Restatement (Second) of Conflicts of Laws §251(2) cmt. e* (1971).

By way of illustrations, *Comment g* to *Section 251* also recognizes that regardless of where the security interest originally attached, the critical consideration in determining applicable law is whether the collateral has an intended temporary or permanent presence in one or the other state. The "intensity of the interest" of the state where the collateral is to be permanently located trumps the general language of *Section 251(2)* regardless of the location of where the lien originally attached. *Restatement (Second) of Conflicts of Laws §251 cmt. g, illus. 1,2 (1971).*

Thus, the general statement found in *Section 251(2)* to the effect that the collateral's location at the time the lien attached will "usually" be given greater weight is further tempered by consideration of whether the collateral is intended to permanently remain in the state where the lien attaches. Here, the Parties admit that there was never any intention for the tooling to remain in Michigan for any considerable time following its manufacture. PMT admits it was "permanently" delivered to Pennsylvania in June of 2004. It appears as if the Shipped Tooling, even to this day, continues to remain in Pennsylvania. On this record the place of "permanent" location of the Shipped Tooling is Pennsylvania. Under the circumstances, *Section 251(2)* is not implicated so as to give the relevant Michigan contacts any greater significance over relevant Pennsylvania

connecting facts.[36]   Because application of *Section 251(2)* as further explained by *Comments e* and

*g* actually requires this Court to give effect to the intended, permanent location of the Shipped

Tooling in determining the state with the "most significant relationship," there can be little argument

that the Pennsylvania contacts, both quantitatively and qualitatively, favor application of

Pennsylvania law as the state of the most significant relationship.[37]

That this Court has found Pennsylvania to be the state of most significant relationship

to the issue at hand is not the end of its analysis.  The Court must now take the next step and weigh

this significant, connecting fact against the policy oriented factors set forth in *Section 6* of the

Second Restatement.  *Gallagher v. Medical Research Consultants, LLP,* 2004 WL 2223312, at *7.

As noted, for our purposes the Second Restatement's applicable field of law is

Property.  *Section 222* of the Second Restatement sets forth the general principle to be applied when

considering a Property issue.  Consistent with the overall philosophy of the Second Restatement and

*Section 251(1)*, when applying the law of the state with the most significant relationship to the issue,

*Section 222* requires the reviewing court to consider the relevant factors found in *Section 6* which

are used in evaluating the significance of the relationship of any potentially interested state and then

finally determine which state's law is to be applied.  *Section 6(2)* of the Second Restatement lists

seven factors a reviewing court may consider when choosing the applicable rule of law.  The seven

---

[36]     Identical considerations as to the relative intended "permanency" of the location of the chattel at the time an "interest" is conveyed is set forth in *Restatement (Second) of Conflict of Laws §244 cmt. f* (1971) (Validity and Effect of Conveyance of Interest In Chattel).

[37]     In determining the state with the most significant relationship, *Comment e* directs the reviewing court to the additional contacts of "domicile, place of incorporation and place of business."  The record before the Court is devoid of any evidence of these contacts but for PMT having a place of business in Michigan and the Debtor having a place of business in Pennsylvania. These contacts weigh equally in favor of each entity and therefore do not affect the Court's determination as to the applicable local law.

factors are as follows:

(a)    the needs of the interstate and international systems,
(b)    the relevant policies of the forum,
(c)    the relevant policies of other interested states and the relative interests of
those states in the determination of the particular issue,
(d)    the protection of justified expectations,
(e)    the basic policies underlying the particular field of law,
(f)    certainty, predictability and uniformity of result, and
(g)    ease in the determination and application of the law to be applied.

The seven factors found in *Section 6* are not listed in any order of priority and, depending on the field under review, may be applied to a greater or lesser degree and vary somewhat in importance. *Restatement (Second) of Conflict of Laws §222 cmt. b* (1971). The Comments to *Section 222*, as do the Comments to other related sections, provide guidance as to the relevant *Section 6* factors to be given consideration in the property field when weighing the appropriate contacts. *Comment b* to *Section 222* states that "protection of the justified expectations of the parties is of considerable importance in the field of Property" and although possibly varying under the specific circumstances, the expectations of transferee and transferor are of "equal importance." *See Restatement (Second) of Conflict of Laws §§222, 6(2)(d)* (1971). Protecting the parties' expectations in turn gives importance to the values of "certainty, predictability and uniformity of result." *See Restatement (Second) of Conflict of Laws §§222, (6)(2)(d)* (1971).

The underlying policies prompting enactment of the Pennsylvania UCC involved simplification, clarification and modernization of the law governing commercial transactions so as to permit the continued expansion of commercial practices through custom, usage and agreement and to make commercial law uniform among the various jurisdictions. *13 Pa.C.S. §1102(b)*; *Griffith v. Mellon Bank, N.A.*, 173 Fed.Appx. 131 (3d Cir. 2006); *In re Remcor, Inc*, 186 B.R. 629 (Bankr.

37

W.D. Pa. 1995).  Pennsylvania courts recognize these reasons for adopting the Uniform Commercial Code which is written in terms of current commercial practices designed to meet the contemporary needs of a fast moving commercial society.  *Triffin v. Dillabough*, 670 A.2d 684 (Pa. Super. Ct. 1996) (quoting *Arcuri v. Weiss*, 184 A.2d 24 (Pa. Super. Ct. 1962)); *H.B. Alexander & Son, Inc. v. Miracle Recreation Equipment Company,* 460 A.2d 343 (Pa. Super. Ct. 1983); *see also* 17 Summ. Pa. Jur. 2d *Commercial Law* §9:1 (2006).  Furthermore, the recently revised Article 9 of the UCC adopted by all 50 states, is designed to create further commercial certainty and predictability by prescribing uniform procedures for establishing security interests and providing methods for perfecting those security interest in any type of property.  68A Am. Jur. 2d *Secured Transactions* §2 (2006).

*Section 9301(a)* of the Pennsylvania UCC identifies the jurisdiction of the applicable law governing the perfection, effect and priority of security interests.  *13 Pa.C.S. §9301(a).*  The local law of where the debtor is located controls.  This policy statement creates a simple and practical process for determining applicable law by recognizing that in almost all cases, the location of the debtor and where the debtor does business will, upon limited research, become readily apparent.  By adopting such a process, the values of "ease in determination and application of the law to be applied" are advanced.  Furthermore, this notion comports with the relevant, ultimate connecting fact identified in this case.  The Debtor, Buffalo Molded, a parts manufacturer for the automotive industry, is located in Pennsylvania.[38]  It's Pennsylvania manufacturing facility is the intended, permanent destination of the Shipped Tooling.  Tooling is a critical and necessary

---

[38]     Nothing in the record indicates, nor have the Parties argued to the contrary, that for purposes of *13 Pa.C.S. §§9301, and 9307,* Pennsylvania is the "location" of the Debtor.

component of the Debtor's manufacturing process.  It cannot be argued that typically the tooling

used by Buffalo Molded in its manufacturing process will be located at the Debtor's manufacturing

facility for more or less permanent periods of time, and definitely, for a time in excess of the

transitory period involved in the manufacture of the tooling itself.  Article 9 also provides additional

protections if the "permanent" location of the collateral is changed.  *See 13 Pa.C.S. §9316.*

When weighing the relevant *Section 6* factors, Pennsylvania's interests as enunciated

by its Uniform Commercial Code comport and are consistent with the identified contact.  The Parties

intended Pennsylvania to be the "permanent" location of the Shipped Tooling which is also the

location of the Debtor pursuant to applicable law.  Because of the nationwide adoption of the UCC,

and specifically Article 9, applying the Pennsylvania UCC rather than the parochial Michigan

Tooling Lien Act under these circumstances serves to protect the justified expectations of parties

when dealing in a commercial setting and promotes the values of certainty, predictability and

uniformity of result.  Nor are the expectations of the Parties sacrificed by applying Pennsylvania

law.[39]  Thus, on balance, by applying its law, Pennsylvania's interests appear to be safeguarded in

all respects.  Since Michigan also adopted the Uniform Commercial Code, despite passage of its

tooling lien act, to a large extent Michigan's policies are similarly protected and advanced as are the

needs and interests of the interstate system.

---

[39]      PMT anticipated the application of Pennsylvania law when it filed its purchase money security interest financing statement pursuant to the Pennsylvania UCC.  Furthermore, PMT, with advance knowledge that the tooling was to manufacture GM parts, possessed alternatives for protecting its lien position under Pennsylvania law, which it recognized at least in part.  It could: (1) file financing statements to protect its purchase money security interest, which it did; (2) approach Comerica to execute an agreement allowing its lien to continue in the proceeds; or, (3) obtain from GM a "third party agreement" whereby PMT as the manufacturer of the tooling would be assured payment prior to delivery.  Although arguing its inability to do so, PMT in fact employed the latter approach with respect to the Unshipped Tooling which gave rise to the 2004 Stipulation.

Previously this Court found Pennsylvania to be the intended permanent location of the Shipped Tooling and therefore the state with the most significant relationship to the issue under review. "Protection of the expectations of the parties" and assuring "certainty, predictability and uniformity of result" also tip in favor of applying Pennsylvania law. Furthermore, analysis of the needs of the interstate system, the ease of determination and application of the Pennsylvania UCC under the identified contact, as well as the relevant policies of Pennsylvania and even Michigan in enacting its own UCC, all favor application of Pennsylvania law. Therefore, this Court finds that the Michigan Tooling Lien Act is inapplicable to the issue under review. The Pennsylvania Commercial Code controls the final decision of this Court upon trial of the pending issues.

It is appropriate to note that at final argument on the pending motions, almost as an "aside" by PMT's counsel, the issue of comity arose for the first time. Barring any statutory law to the contrary, application of the doctrine of comity may allow this Court to give effect to the Michigan Tooling Lien Act. *In re Eddingfield*, 67 B.R. 1000, 1004 (Bankr. C.D. Ill 1986) (citing *Walworth v. Harris*, 129 U.S. 355 (1889)). Comity is not a concrete rule of law, but rather one of practice, convenience and expediency. *Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir. 1997); 45 Am. Jur. 2d *International Law* §7 (2006); 15A C.J.S. *Conflict of Laws* §6 (2006). While the doctrine of comity is not obligatory, and more of courtesy and accommodation than anything else, it does provide an opportunity for recognizing the law of other states unless doing so would be prejudicial to the interests of the resident state. *U.S.A. ex rel. Saroop v Garcia*, 109 F.3d 165 (3d Cir. 1997). Prior to this point, the issue has neither been briefed nor argued. The issue was not formally raised as an alternative finding by any Party. As such, the Court will refrain from entering any decision on the comity issue at this time and allow an

40

opportunity for the matter to be formally raised and addressed prior to the time of trial on the substantive issues.

### CONCLUSION

For the reasons stated the *Michigan Ownership Rights in Dies, Molds and Forms Act, M.C.L. §§445.611 et seq.* is inapplicable to the within matter. The separate and distinct lien created under the Michigan Tooling Lien Act is not recognized since Pennsylvania law applies in the instant controversy. Therefore, the Pennsylvania Uniform Commercial Code, *13 Pa.C.S. §1101 et seq.*, is to be applied by the Court in rendering its final decision in regard to the pending issues. Because on this record genuine issues of material fact exist as to the characterization of the Shipped Tooling as either inventory or equipment, the Court is unable to finally decide the matter before it on the basis of summary judgment. The Stipulation entered among the Parties and approved by this Court by Order dated December 16, 2004 does not create an independent basis for Defendant, Plastic Mold Technology, Inc., to recover the funds represented by the escrow. Following trial on the pending matters, the escrow funds will be distributed to Plastic Mold Technology, Inc., Buffalo Molded Plastics, Inc. and/or Comerica Bank as their interests appear. To the extent Plastic Mold Technology, Inc. has withdrawn its claim for the Unshipped Tooling in the amount of $16,300, the Court will refrain from entering judgment in this regard until the conclusion of trial in this case. Therefore, for the foregoing reasons, the *Joint Motion for Summary Judgment* filed by Plaintiff Buffalo Molded Plastics, Inc. and Defendant Comerica Bank is denied. The *Cross-Motion for Summary Judgment* filed by Defendant Plastic Mold Technology, Inc. is likewise denied. The Court

will convene a Status Conference for purposes of resolving any other outstanding pretrial issues and

to set a time for trial.

An appropriate order will be entered.[40]

Dated this *28th* day of *November, 2006*
_____
Thomas P. Agresti
U.S. Bankruptcy Judge

Case Administrator to serve:
        David B. Salzman, Esq.
        Willard E.  Hawley, Esq.
        Mary Kay Shaver, Esq.
        Beverly Weiss Manne, Esq.
        Ralph E.  McDowell, Esq.

---

[40]        This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| BUFFALO MOLDED PLASTICS, INC. | : | Bankruptcy Case No. 04-12782-TPA |
| d/b/a/ ANDOVER INDUSTRIES | : | Chapter 11 |
| Debtor, | : | |
| | : | |
| BUFFALO MOLDED PLASTICS, INC. | : | |
| d/b/a ANDOVER INDUSTRIES | : | |
| Plaintiff, | : | |
| | : | Adversary No. 05-01111-TPA |
| v. | : | |
| | : | |
| PLASTIC MOLD TECHNOLOGY, INC. | : | Related to Document No. 20, 25 |
| AND COMERICA BANK | : | |
| Defendants | : | Hearing: January 15, 2007 at 10:00 A.M. |

**<u>ORDER OF COURT</u>**

**AND NOW**, this *28th* day of *November, 2006*, for the reasons expressed in the Memorandum Opinion of even date, it is hereby **ORDERED, ADJUDGED and DECREED** that the *Joint Motion for Summary Judgment* filed by Plaintiff, Buffalo Molded Plastics, Inc., and Defendant, Comerica Bank, is **DENIED**. Defendant, Plastic Mold Technology, Inc.'s *Cross-Motion for Summary Judgment* is **DENIED**.

It is **FURTHER ORDERED** that a Status Conference on the issues remaining for purposes of trial is scheduled via video conference for *Monday, January 15, 2007 at 10:00 A.M.* in Courtroom D, 54th Floor, U.S. Steel Building, 600 Grant Street, Pittsburgh, PA 15219.

Thomas P. Agresti
U.S. Bankruptcy Judge

cc: Case administrator to serve:
    David B. Salzman, Esq.
    Willard E. Hawley, Esq.
    Mary Kay Shaver, Esq.
    Beverly Weiss Manne, Esq.
    Ralph E. McDowell, Esq.